IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO.  08-733 |
| DANIEL LAIKIN | : | |

**GOVERNMENT'S CHANGE OF PLEA MEMORANDUM**

**I.   Introduction**

On December 15, 2008, the grand jury returned an indictment charging defendant Daniel Laikin with conspiracy and securities fraud, in violation of 18 U.S.C. §371, 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, for his role in a scheme to illegally manipulate the stock price of National Lampoon, Inc. ("National Lampoon").  The defendant has agreed to plead guilty pursuant to plea agreement with the government and is scheduled for a change of plea hearing on November 23, 2009 at 12:00 p.m.

**II.   Plea Agreement**

The government and the defendant have entered a written plea agreement which is attached to this memorandum.  The key provisions of this agreement provide that the defendant will: (1) plead guilty to Count 1 (conspiracy to commit securities fraud) of the indictment; (2) pay a fine and restitution (if any) as directed by the Court; and (3) waive his rights to appeal or collaterally attack his conviction and sentence as follows:

The defendant expressly waives all rights to appeal or collaterally attack the his conviction, sentence, or any other matter relating to this prosecution, whether such a right to

appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law, unless, (a) the government appeals from the sentence or, (b) the defendant's sentence on any count of conviction exceeds the statutory maximum for that count; (c) the sentencing judge erroneously departed upward pursuant to the Sentencing Guidelines; or (d) the sentencing judge, exercising the Court's discretion pursuant to United States v. Booker, 543 U.S. 220 (2005), imposed an unreasonable sentence above the final Sentencing Guideline range determined by the Court.

  The government agrees to dismiss Count Two of the Indictment at the time of sentencing. In addition, the government agrees that it will not bring any criminal charges against the defendant for conduct relating to any attempt to manipulate the stock price of Red Rock Picture Holdings, Inc. that preceded the date of the agreement.

  The plea agreement also includes the following stipulations:

   (a) The parties agree and stipulate that under USSG §2B1.1(a)(2), the base offense level for the defendant's conduct is 6; that under USSG §2B1.1(b)(1)(J) the fraud loss intended to be caused in furtherance of the criminal activity jointly undertaken by the defendant and his co-conspirators for which the defendant is responsible was between $2,500,000 and $7,000,000; this amount was within the scope of the defendant's agreement; this amount was reasonably foreseeable to the defendant in connection with the conspiracy; and the defendant's Guideline range should be calculated based on this amount pursuant to USSG §1B1.3, increasing the base offense level by 18 levels.

   (b) The parties agree and stipulate that the defendant's offense involved a violation of securities law and, at the time of the offense, the defendant was an officer and

director of a publicly traded company, increasing the base offense level by 4 levels pursuant to USSG §2B1.1(b)(16)(A)(i).

(c) The parties agree and stipulate that, as of the date of this agreement, the defendant has demonstrated acceptance of responsibility for his offense making the defendant eligible for a 2-level downward adjustment under USSG § 3E1.1(a).

(d) The parties agree and stipulate that, as of the date of this agreement, the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying the government of his intent to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, resulting in a 1-level downward adjustment under USSG § 3E1.1(b).

(e) The parties agree and stipulate that they will not seek either an upward or a downward departure under the Sentencing Guidelines; the parties reserve their rights to seek a variance under 18 U.S.C. [s] 3553(a), United States v. Booker, 543 U.S. 220 (2005), United States v. Gall, 128 S. Ct. 586 (2007), and United States v. Kimbrough, 128 S. Ct. 558 (2007) (collectively "Booker").  Thus, the parties are free to seek a sentence outside of the advisory Guidelines range for any of the reasons permitted under Booker, including, but not limited to, any reason that might otherwise be considered a basis for a Departure under the Sentencing Guidelines.  This includes, but is not limited to, an argument from the defense (to which the government would object) that the applicable offense level overstates the seriousness of the offense.  The parties further agree that the Court's discretion in imposing a sentence outside of the advisory Guidelines range is unaffected by the fact that the request is made for reasons

permitted under Booker where there may exist a similar basis for a Departure under the Sentencing Guidelines.

### III.  Essential Elements of the Offenses

####   A.  Conspiracy (18 U.S.C. § 371)

To establish conspiracy, the government must prove the following elements beyond a reasonable doubt:

(1) Two or more persons conspired;

(2) To commit an offense against the United States; and,

(3) One or more persons did any act to effect the object of the conspiracy.

####   B.  Securities Fraud

15 U.S.C. § 78j (b) and 17 C.F.R. § 240.-10b-5 together constitute the primary criminal securities fraud enforcement mechanism.

To establish a securities fraud violation under these statutes, the government must prove the following four elements beyond a reasonable doubt:

(1) The defendant did any one or more of the following, as charged in the indictment:

(a) knowingly employed a device, scheme, or artifice to defraud; or

(b) knowingly made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) knowingly engaged in a transaction, practice or course of business that operated or would operate as a fraud and deceit on any person;

(2) The defendant did so in connection with the purchase or sale of a security;

(3) In connection with the purchase or sale of a security, the defendant made use of or cause the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange; and

(4) The defendant acted knowingly, willfully, and with the intent to defraud.

## IV.    Maximum Penalties

The maximum penalty for the charge is as follows:

Count One (Conspiracy): 5 years imprisonment; a $250,000 fine, 3 years supervised release, and a $100 special assessment.

## V.    Factual Basis for the Plea

Defendant is one of four individuals[1] charged for their roles in a conspiracy to artificially inflate the stock price of National Lampoon, Inc., a company based in Los Angeles, California that was involved primarily in media projects, including feature films, television programming, online and interactive entertainment, home video, and book publishing.  National Lampoon owned interests in all major National Lampoon properties, including the movies Animal House and the Vacation series.   National Lampoon was publicly traded on the American Stock Exchange.[2]

---

[1] The other three individuals, Dennis Barsky, Timothy Dougherty, and Eduardo Rodriguez have all pleaded guilty and agreed to cooperate in this investigation.

[2] Once this scheme became public, National Lampoon's share price predictably plummeted.  As a result, National Lampoon was removed from its listing on the American Stock Exchange and now trades as an over-the-counter or "penny stock."

In 2008, defendant participated in a conspiracy to artificially inflate the stock price of National Lampoon. At that time, defendant was the CEO of National Lampoon and personally owned approximately one million shares of the company. Defendant thus had a tremendous financial and professional stake in the success of the company's stock price. Unfortunately for defendant, with free market forces at work, the stock was performing below his expectations. This was especially problematic for the defendant because the low price interfered with his ability to make significant business deals that involved the company's stock and the stock was facing a possible delisting by the American Stock Exchange for its low valuation.

Defendant pursued illegal ways to improve the price of the stock from approximately $1.80 per share, where it was languishing, to $5.00 per share, where the defendant believed he could generate significant profits. In particular, defendant sought this increase so that he could use the inflated price to make the company appear more attractive for what he called "strategic partnerships" and "acquisitions," by creating the illusion that National Lampoon was worth substantially more than it actually was. This scheme, if successful, would have wreaked havoc on the market for this stock and injured its investors, including any companies and institutions that defendant used for the deals identified above. Likewise, those involved in the scheme were positioned to profit substantially from the artificially inflated value of the stock, both through sales of the stock and any deals that the company could make based on the illusion of its more attractive valuation.

To achieve his illegal goals, defendant enlisted a number of other individuals to help him artificially inflate the price of the stock. They generated buying in the stock, that was

not based on free market forces, to make it appear as if there was significant interest in the stock when, in fact, there was little or no such interest. By giving this false impression to the investing public that there was significant market interest in the stock, they hoped to generate real buying from the public and thus artificially increase the price of the stock. Defendant paid a number of individuals to assist in the scheme.

Defendant hired co-defendant Dennis Barsky to help him artificially inflate National Lampoon stock in exchange for stock issued to him by the company which falsely listed Barsky as a "consultant" eligible for such stock grants. Barsky provided a buffer between defendant and the individuals that they had hired to generate volume purchases in National Lampoon stock to artificially increase the stock's price. One of these individuals was Eduardo Rodriguez, and the other was Kevin Waltzer, who at the time, was cooperating with the government.

In or about March 2008, defendant agreed to pay Rodriguez approximately $60,000 to help create artificial volume in National Lampoon stock. Defendant understood that Rodriguez would keep a portion of the payment as a fee and would use the balance of the payment to either bribe brokers to cause their clients and others to purchase National Lampoon stock or pay other stock promoters to assist in the scheme. The defendant then continued his participation in the conspiracy by sending confidential company information to his co-conspirators and arranging for the bribes to be delivered to the other participants in the scheme who were generating the artificial buying.

For example, on March 14, 2008, defendant caused National Lampoon's

Depository Trust Company Reports ("DTC Reports") to be emailed to Rodriguez. These reports contained lists of the investment houses that held the securities on behalf of their customers and are not generally available to the investing public. These reports are valuable to participants in stock manipulation schemes to help them keep track of the entities that hold a stock at any given point in time.

On March 19, 2008, defendant arranged for approximately $60,000 to be wire transferred from a bank account in Indianapolis, Indiana, to a bank account in Blue Bell, Pennsylvania, for the benefit of Rodriguez as payment for generating volume purchases in National Lampoon stock. That same day, Rodriguez wire transferred $40,000 to co-defendant Timothy Dougherty in exchange for manipulative purchases in the stock. Rodriguez's initial efforts to inflate the stock with Dougherty's assistance were unsuccessful. Rodriguez then turned to Waltzer, whom he believed had a greater capacity to engage in manipulative trading that could actually inflate the stock's price to defendant's satisfaction.

On May 1, 2008, defendant, Rodriguez, and Waltzer met in Los Angeles, California to discuss artificially inflating National Lampoon stock. During this recorded meeting, defendant said, among other things, that he was working with others to inflate the stock price and that defendant and his partners owned approximately 70 percent of the company. Defendant explained that he wanted to get National Lampoon's stock price up to $5.00 per share from approximately $1.80 per share so that it would be more attractive for "strategic partnerships" and "acquisitions." Defendant agreed to pay Rodriguez and Waltzer approximately 17 percent or "one for six" of the value of National Lampoon stock that they caused to be purchased and held with further stock incentives if the stock price hit certain

8

benchmarks. Defendant also improperly provided Rodriguez and Waltzer with non-public information regarding National Lampoon's financial performance.

On May 14, 2008, defendant sent Rodriguez the National Lampoon non-objecting beneficial owners list ("NOBO list"). A NOBO list is a record containing the names of all the owners of a stock at a given point in time and is regularly updated to reflect shifts in ownership. This list generally is not available to the public and is valuable to participants in stock manipulation schemes to keep track of who owns the stock at any given time.

On May 19, 2008, defendant shared with Rodriguez the confidential contents of an upcoming National Lampoon press release. Defendant had arranged for the press release to be made public on the following day to coordinate the timing of the release with the stock purchases that Rodriguez and Waltzer caused as part of their conspiracy to manipulate National Lampoon stock.

On May 20, 2008, as part of the stock manipulation scheme, defendant caused Waltzer's "group" to purchase approximately 25,000 shares of National Lampoon common stock at a price of approximately $2.03 per share for a total of approximately $50,750. Those trades were settled using undercover FBI funds. On May 22, 2008, defendant had $8,333 wired to an account controlled by Eduardo Rodriguez as payment for the purchases in National Lampoon stock. That same day, Rodriguez wired approximately $6,625 to an undercover account maintained by the FBI in Philadelphia.

On June 2, 2008, defendant caused updated confidential National Lampoon DTC Reports to be emailed to Rodriguez with the objective of continuing the illegal manipulation scheme.

                              MICHAEL L. LEVY
                              United States Attorney

                              _____

                              DEREK A. COHEN
                              LOUIS D. LAPPEN
                              Assistant United States Attorneys

Date: September 22, 2009

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing Government's Change of Plea Memorandum has been served via email upon:

Joseph G. Poluka, Esq.
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998

                                                                 _____
                                                                 DEREK A. COHEN
                                                                 Assistant United States Attorney

Date: September 22, 2009